# Exhibit C

**ROSENBAUM & ASSOCIATES, P.C.**
BY: Denine Marie Moscariello, Esquire
Attorney I.D. No.: 90192
1818 Market Street – Suite 3200
Philadelphia, PA 19103
(215) 569-0200

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED

ATTORNEY FOR PLAINTIFF(S)

Filed and Attested by the
Office of Judicial Records
06 NOV 2025 01:11 pm
C. SMITH

| | | |
|---|---|---|
| DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY<br>2711 West Allegheny Avenue<br>Philadelphia, Pennsylvania  19132 | : <br> : <br> : <br> : <br> : <br> : | PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br><br>MAY TERM, 2025<br>NO.: 000445 |
| v. | : <br> : | |
| WM OPERATING, LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER<br>9209 Ridge Pike<br>White Marsh, Pennsylvania  19128 | : <br> : <br> : <br> : <br> : | |
| and | : <br> : | |
| WM HOLDINGS, LLC<br>9209 Ridge Pike<br>White Marsh, Pennsylvania  19128 | : <br> : <br> : <br> : | |
| and | : <br> : | |
| PREMIER HEALTHCARE MANAGEMENT, LLC<br>199 Community Drive<br>Great Neck, New York  11201 | : <br> : <br> : <br> : | |
| and | : <br> : | |
| JONATHAN BLEIER<br>1 Sam Law Drive<br>Monsey, New York  10952 | : <br> : <br> : <br> : | |
| and | : <br> : | |
| JACOB SOD<br>58 Larch Hill Road<br>Lawrence, New York  11559 | : <br> : <br> : <br> : | |
| and | : <br> : | |
| JOHN DOES 1-4 (Fictitious Defendants) | : | |

## CIVIL ACTION
## NOTICE

YOU HAVE BEEN SUED IN COURT.  IF YOU WISH TO DEFEND AGAINST THE CLAIMS SET FORTH IN THE FOLLOWING PAGES, YOU MUST TAKE ACTION WITHIN TWENTY (20) DAYS

Case ID: 250500445

AFTER THIS COMPLAINT AND NOTICE ARE SERVED BY ENTERING A WRITTEN APPEARANCE PERSONALLY OR BY ATTORNEY AND FILING IN WRITING WITH THE COURT YOUR DEFENSES OR OBJECTIONS TO THE CLAIMS SET FORTH AGAINST YOU.  YOU ARE WARNED THAT IF YOU FAIL TO DO SO THE CASE MAY PROCEED WITHOUT YOU AND A JUDGMENT MAY BE ENTERED AGAINST YOU BY THE COURT WITHOUT FURTHER NOTICE FOR ANY MONEY CLAIMED IN THE COMPLAINT OR FOR ANY OTHER CLAIM OR RELIEF REQUESTED BY THE PLAINTIFF.  YOU MAY LOSE MONEY OR PROPERTY OR OTHER RIGHTS IMPORTANT TO YOU.  YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

**Philadelphia Bar Association**
**1101 Market Street – 11th Floor**
**Philadelphia, PA 19107**
**Phone: (215) 238-6300**

## AVISO

LE HAN DEMANDADO A USTED EN LA CORTE. SI USTED QUIERE DEFENDERSE DE ESTAS DEMANDAS EXPUESTAS EN IAS PAGINAS SIGUIENTES, USTED TIENE VIENTE (20) DIAS DE PLAZO AL PARTIR DE LA FECHA DE LA DEMANDA Y LA NOTIFICACION.  HACE FALTA ASENTAR UNA COMPARENCIA ESCRITA O EN PERSONA O CON UN ABOGADO Y ENTREGAR A LA CORE EN FORMA ESCRITA SUS DEFENSAS O SUS OBJECIONES A LAS DEMANDAS EN CONTRA DE SU PERSONA.  SEA AVISADO QUE SI USTED NO SE DEFIENDE, LA CORTE TOMARA MEDIDAS Y PUEDE CONTINUAR LA DEMANDA EN CONTRA SUYA SIN PREVIO AVISO O NOTIFICACION.  ADEMAS, LA CORTE PUEDE DECIDIR A FAVOR DEL DEMANDANTE Y REQUIERE QUE USTED CUMPLA CON TODAS LAS PROVISIONES DE ESTA DEMANDA.  USTED PUEDE PERDER DINERO O SUS PROPIEDADES U OTROS DERECHOS IMPORTANTES PARA USTED.  LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

**Servicio de referencia e información de abogados**
**Colegio de Abogados del Condado de Philadelphia**
**Philadelphia Bar Association**
**1101 Market Street – 11th Floor**
**Philadelphia, PA 19107**
**Phone: (215) 238-6300**

Case ID: 250500445

**ROSENBAUM & ASSOCIATES, P.C.**
BY: Denine Marie Moscariello, Esquire
Attorney I.D. No.: 90192
1818 Market Street – Suite 32000
Philadelphia, PA 19103
(215) 569-0200

MAJOR-JURY
ASSESSMENT OF DAMAGES
HEARING IS REQUIRED

ATTORNEY FOR PLAINTIFF(S)

| | | |
|---|---|---|
| DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY<br>2711 West Allegheny Avenue<br>Philadelphia, Pennsylvania 19132<br><br>v.<br><br>WM OPERATING, LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER<br>9209 Ridge Pike<br>White Marsh, Pennsylvania 19128<br><br>and<br><br>WM HOLDINGS, LLC<br>9209 Ridge Pike<br>White Marsh, Pennsylvania 19128<br><br>and<br><br>PREMIER HEALTHCARE MANAGEMENT, LLC<br>199 Community Drive<br>Great Neck, New York 11201<br><br>and<br><br>JONATHAN BLEIER<br>1 Sam Law Drive<br>Monsey, New York 10952<br><br>and<br><br>JACOB SOD<br>58 Larch Hill Road<br>Lawrence, New York 11559<br><br>and<br><br>JOHN DOES 1-4 (Fictitious Defendants) | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br><br>MAY TERM, 2025<br>NO.: 000445 |

Case ID: 250500445

**COMPLAINT**

Plaintiff, Deborah Terry, by her Attorney-in-Fact, David Terry, by and through counsel, Rosenbaum & Associates, P.C., files this Complaint in Civil Action, and avers as follows:

1.      Plaintiff, Deborah Terry, is an adult individual residing at Defendants' facility, located at 9209 Ridge Pike, Philadelphia, Pennsylvania 19128.  David Terry, Attorney-in-Fact for Deborah Terry, is an adult individual and son of Deborah Terry, residing herein at 2711 West Allegheny Avenue, Philadelphia, Pennsylvania 19132.

2.      Defendant, WM Operating, LLC d/b/a Meadowview Rehabilitation and Nursing Center, is a business corporation organized and existing under the bylaws of the Commonwealth of Pennsylvania and was engaged in the business of owning, operating, managing and offering healthcare, medical services, nursing care and long-term care to the public at a nursing home facility, Meadowview Rehabilitation and Nursing Center ("Meadowview"), located at 9209 Ridge Pike,  Philadelphia, Pennsylvania 19128.  Plaintiff is asserting a professional liability claim against this Defendant.

3.      At all times material hereto, Defendant, WM Operating, LLC d/b/a Meadowview Rehabilitation and Nursing Center, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of  Meadowview from the time Deborah Terry was admitted to Meadowview on February 7, 2018, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Deborah Terry, starting on  February 7, 2018, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Meadowview, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of  Defendants, all of whom were then and there acting within the scope of their authority

Case ID: 250500445

and in the course of their employment with Defendant, WM Operating, LLC d/b/a Meadowview Rehabilitation and Nursing Center, and in furtherance of Defendant, WM Operating, LLC d/b/a Meadowview Rehabilitation and Nursing Center's business and on behalf of Defendant, WM Operating, LLC d/b/a Meadowview Rehabilitation and Nursing Center.

4. Defendant, WM Holding, LLC, is a business corporation organized and existing under the bylaws of the Commonwealth of Pennsylvania and was engaged in the business of owning, operating, managing and offering healthcare, medical services, nursing care and long-term care to the public at a nursing home facility, Meadowview Rehabilitation and Nursing Center ("Meadowview"), located at 9209 Ridge Pike, Philadelphia, Pennsylvania 19128. Plaintiff is asserting a professional liability claim against this Defendant.

5. At all times material hereto, Defendant, WM Holding, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Meadowview from the time Deborah Terry was admitted to Meadowview on February 7, 2018, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Deborah Terry, starting on February 7, 2018, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Meadowview, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, WM Holding, LLC, and in furtherance of Defendant, WM Holding, LLC's business and on behalf of Defendant, WM Holding, LLC.

6. Defendant, Premier Healthcare Management, LLC, is a business corporation organized and existing under the bylaws of the state of New York and was engaged in the business of owning, operating,

Case ID: 250500445

managing and offering healthcare, medical services, nursing care and long-term care to the public at a nursing home facility, Meadowview Rehabilitation and Nursing Center ("Meadowview"), located at 9209 Ridge Pike, Philadelphia, Pennsylvania 19128. Plaintiff is asserting a professional liability claim against this Defendant.

7. At all times material hereto, Defendant, Premier Healthcare Management, LLC, acted or failed to act by and through its agents, ostensible agents, servants, workmen, nurses, nurse's aides, and/or employees, physicians, the nursing home administrators and/or administrators responsible for formulating, adopting, monitoring and enforcing the policies, procedures and protocols of Meadowview from the time Deborah Terry was admitted to Meadowview on February 7, 2018, including the physicians, nurses, nurses' aides, staff members and employees responsible for the care, supervision, treatment and safety of Deborah Terry, starting on February 7, 2018, which includes those physicians, nurses, nurses' aides, staff and employees identified in the records and charts of Meadowview, whose names cannot be discerned from the records but whose identities are known to and within the exclusive control of Defendants, as well as those physicians, nurses, nurses' aides, staff and employees whose names are not recorded in the records due to Defendants' failure to implement and utilize proper record-keeping and documentation procedures but whose identities are known to and within the exclusive control of Defendants, all of whom were then and there acting within the scope of their authority and in the course of their employment with Defendant, Premier Healthcare Management, LLC, and in furtherance of Defendant, Premier Healthcare Management, LLC's business and on behalf of Defendant, Premier Healthcare Management, LLC.

8. Defendant, Jonathan Bleier, is an individual residing herein at 1 Sam Law Drive, Monsey, New York 10952. At all times material hereto, Defendant, Jonathan Bleier, was engaged in the business of owning, operating, managing and controlling nursing homes, including Meadowview Rehabilitation and Nursing Center ("Meadowview"), during Deborah Terry's residency. Defendant, Jonathan Bleier, was at all time materials and relevant hereto, the employer, supervisor and/or partner of all other Defendants listed herein, and is therefore personally, jointly and vicariously liable, among other things, for the acts and omissions of himself and his agents, employees, servants, contractors, staff, and/or partners and all other

Case ID: 250500445

Defendants, all of whom played a role in the operation of Meadowview and the care provided to Deborah Terry.

9.      Defendant, Jacob Sod, is an individual residing herein at 58 Larch Hill Road, Lawrence, New York 11559.  At all times material hereto, Defendant, Jacob Sod, was engaged in the business of owning, operating, managing and controlling nursing homes, including Meadowview Rehabilitation and Nursing Center ("Meadowview"), during Deborah Terry's residency. Defendant,  Jacob Sod, was at all time materials and relevant hereto, the employer, supervisor and/or partner of all other Defendants listed herein, and is therefore personally, jointly and vicariously liable, among other things, for the acts and omissions of himself and his agents, employees, servants, contractors, staff, and/or partners and all other Defendants, all of whom played a role in the operation of Meadowview and the care provided to Deborah Terry.

10.      Defendants, Joe Does 1-4 (Fictitious Defendants) are individuals, corporations and/or other entities whose identities, after reasonable investigation, are currently unknow, but at all times relevant hereto owned, operated, controlled and/or managed Meadowview Rehabilitation and Nursing Center, and/or provided medical, nursing, rehabilitation and other health care services to Deborah Terry during her residency at Meadowview.

11.      At all times material hereto, the Defendants individually and collectively owed duties to the residents of Meadowview Rehabilitation and Nursing Center, including Deborah Terry.

12.      At all times relevant and material hereto, the Defendants were aware of their obligations under the laws of the United States of America and of the Commonwealth of Pennsylvania with which Defendants were required to comply in providing care to Decedent including the United States Code, Pennsylvania Consolidated Statutes, and the Pennsylvania Administrative Code.

13.      Meadowview Rehabilitation and Nursing Center is categorized by the Pennsylvania of Department of Health as a "for- profit" skilled nursing care facility corporation.

14.      The Defendants, directly and/or through their respective agents, servants and/or employees, accepted the responsibility for the care of Deborah Terry, and in so doing, undertook and/or

Case ID: 250500445

assumed a duty to Deborah Terry to provide a safe nursing home facility necessary for the proper practice of medicine at said nursing home facility and to render reasonable, competent, proper, adequate and appropriate medical care, skilled nursing home facility care, custodial care, nursing home services and treatment and to take appropriate, preventative and curative measures as well as adequately supervise, monitor, and provide timely treatment and services to Deborah Terry and avoid and prevent harm to her.

15.     The Defendants owed a duty to Deborah Terry to exercise reasonable and ordinary care as a resident at Defendants' facility receiving medical, nursing and other allied healthcare services. The Defendants' duties included, but were not limited to, establishing and enforcing their respective nursing home facility rules and regulations, medical staff practices, bylaws, policies, procedures, rules and regulations which mandate provision of proper medical, nursing and other healthcare provider services and/or care to the nursing home residents, including Deborah Terry.  The Defendants' duties also included hiring competent medical, nursing and other allied healthcare personnel, continuing and ongoing review of said competency, maintaining the facility such that it is free from ordinary hazards and defective equipment, maintaining sufficient staffing levels, insuring that all residents receive adequate, competent and timely medical, nursing and other allied health care treatment and services while residing in their nursing facility, and, establishing and enforcing policies, procedures, protocols and systems to monitor their staff to ensure that all residents are receiving proper and timely care and treatment including, but not limited to, complete and accurate resident assessments, developing, enforcing and revising individualized, resident-centered care plans, adequate supervision/monitoring, proper use of medication, proper use of physical and/or chemical restraints, proper establishment and enforcement of procedures for medical and nursing review and/or audit of the care given to residents, proper establishment of policies, procedures, protocols and guidelines to ensure that proper medical, custodial and nursing care are performed on and for residents at their nursing home, including  Deborah Terry.

16.     At all times relevant hereto, the Defendants, directly and/or through contractual agreement had a corporate responsibility through their respective bylaws, medical staff bylaws, rules, regulations and ongoing government functions to assure that only competent physicians, nurses and other health care

providers engage in the medical and skilled nursing practice at this skilled care nursing home facility and their related fields of medicine on the Defendants' premises.

17.    Defendants have failed to adequately train and/or supervise their physicians, nurses, nurses' aides and other healthcare providers which has resulted in personal harm and injury to Deborah Terry.

18.    The provisions of OBRA (Omnibus Budget Reconciliation Act of 1987) are applicable with regard to Deborah Terry's condition as it existed while in the Defendants' care and during her residency at the Defendants' facility beginning on February 7, 2018.

19.    The Defendants held themselves out a specialist in the field of adult nursing care with the expertise necessary to maintain the health and safety of persons unable to care adequately for themselves.

20.    At all times pertinent hereto, Deborah Terry was a resident at Meadowview and was under the exclusive care and control of the Defendants, their agents, officers, servants and/or employees.

21.    The Defendants, their agents, officers, servants and/or employees failed, refused and/or neglected to perform the duties to provide reasonable and adequate health care to and for Deborah Terry, who was unable to attend to her own health, safety and well-being.

22.    The Defendants, their agents, officers, servants and/or employees negligently, carelessly and recklessly provided care and treatment to Deborah Terry, and all of the alleged acts, omissions and occurrences herein described or performed by the Defendants, their agents, officers, servants and/or employees fell within the course and scope of their agency and employment with the Defendants and in furtherance of the Defendants' business.

23.    The Defendants provide twenty-four (24) hour a day, seven (7) day a week medical, nursing, custodial and rehabilitation care, services and assistance to its residents who have issues related to age, illness, disease, injury, convalescence and physical and mental infirmity.

24.    The Defendants are responsible for nearly all the health care needs of its residents including, but not limited to, assistance with activities of daily living, bed mobility, transfer, ambulation,

Case ID: 250500445

personal hygiene, nutrition, hydration, restorative care, incontinence care, turning and repositioning, supervision, monitoring, safety and rehabilitation.

25.    The Defendants are responsible for ensuring that all doctor-ordered testing and medical services are performed.

26.    The Defendants are required to conduct comprehensive and accurate assessments of their residents' functional capacity, as well as their residents' needs and risk factors.

27.    The Defendants are required to formulate and develop an individualized health "Care Plan" upon admission of each resident.

28.    The Defendants are responsible for determining residents' risk level for injury including injuries related to improper transfers via mechanical lift.

29.    The Defendants are responsible for formulating, adopting, modifying and implementing injury prevention programs and care directives, including prevention programs for residents who required transfers via mechanical lift.

30.    The Defendants are responsible for ensuring that injury prevention programs, procedures and protocols are implemented, executed and performed including prevention programs and procedures to prevent injuries related to mechanical lift transfers.

31.    The Defendants are responsible for ensuring that a "Care Plan" is personalized for each resident and modified and/or revised as needs change.

32.    The Defendants are responsible for ensuring that a "Care Plan" for residents includes safety measures and interventions to prevent injuries related to mechanical lift transfers.

33.    The Defendants are responsible for ensuring that safety measures and interventions, including adequate pressure-relieving assistive devices individualized turning and repositioning schedule, implementation of the appropriate infection control policies, procedures and techniques, hydration and nutrition protocols, adequate and timely incontinence care, hygiene services, adequate supervision and monitoring of residents with decreased mobility, safety awareness and cognition are implemented and executed.

Case ID: 250500445

34.    Deborah Terry was admitted to Meadowview Rehabilitation and Nursing Center on February 7, 2018,  with diagnoses including hemiplegia and hemiparesis following cerebral infarction, chronic embolism and thrombosis, difficulty in walking, major depressive disorder, heart failure, cerebral infarction, aphasia, peripheral vascular disease, essential hypertension, type 2 diabetes mellitus, morbid (severe) obesity, hyperlipidemia, muscle weakness, abnormalities of gait and mobility, lack of coordination, open wound (right foot) and hematogenous osteomyelitis.

35.    The  "Admission Progress Note" documented:

*1/9 N/A. Resident received via ambulance at 9:40pm. DX. Of Osteomyelitis; PMHx: of Hyperlipidemia, HTN, morbid obesity, Atrial fibrillation, right foot TMA.  Resident AAOX3, able to make needs known, no s/s or verbal c/o pain.  SBO and coughing wheezing +RA.  Abdomen soft, non-tender, bowel sounds + all 4 quads, incontinent of b/b.  Resident is 2-3 assist, able to feed self with setup.  Resident has b/l under fold breast rash, left armpit rash, and abdominal fold rash.  R stump ulcer chronic wound pink yellow slough measuring length of 5cm and 7cm wide. Dry skin, b/lle build up dead skin tissues. Allergies to Ace inhibitor. ABT Cefazolin 3 gram. Resident has right upper extremity single lumen picc line. MD made aware of N/A and meds fax to pharmacy. VS 132/84, 84, 18, 98.4, 92%RA. PPD Giving Left forearm LOT#304100 exp 4/19.*

36.    On February 8, 2018, the Meadowview staff initiated a "Care Plan" for "MY DAILY CARE/ADLS: I have an ADL self care deficit r/t decreased strength and mobility" with the "Intervention" to  *"TRANSFER: Utilize Mechanical Lift for transfers."*  This "Care Plan" did not specify the type of mechanical lift or sling size the Meadowview staff was to use to transfer Deborah Terry via mechanical lift and a "Care Plan" was not initiated for mechanical lift transfers.

37.    On February 8, 2018, a "Care Plan"  was initiated for "MY FALLS: I am at risk for falls related to decreased mobility, obesity (500 pounds) and a wound on my foot."

38.    On February 22, 2018, the "Weight and Vitals Summary" documented Deborah Terry's weight as *"479 lbs"*.

39.    On February 23, 2018, a "Care Plan" was initiated for "Deborah is at risk for alteration in nutrition/hydration r/t need for therapeutic diet r/t DM, HTN, HLD and AFib. Morbidly Obese per BMI. Questionable weight fluctuations" with the "Goal" for "*Deborah's weight will be stable without significant changes thru next review.  Goal weight is to remain stable 438 +/- 5% through the next review."*

Case ID: 250500445

40.     On August 29, 2019, a "Care Plan" was initiated for "Deborah Terry is a bariatric resident" with "Interventions" including:

*Ms. Terry will have a bariatric wheel chair*

*Ms. Terry will have a functioning bariatric bed*

*Ms. Terry will have bariatric gowns and briefs available*

*Utilize Mega Mover in case of evacuation*

41.     A "Mechanical Lift Care Plan was not initiated for Deborah Terry.

42.     On May 1, 2023, a "Brief Interview for Mental Status" (3.0 BIMS) was completed for Deborah Terry with a score of *"8"* which categorized her as *"Moderately Impaired"*.

43.     The "Transfer Intervention" for the "Care Plan" for "MY DAILY CARE/ADLS: I have an ADL self care deficit r/t decreased strength and mobility" was revised to *"TRANSFER: oob to geri chair with use of 2 staff members using mechanical lift."* This "Care Plan" did not instruct staff which mechanical lift or sling to utilize when transferring Deborah Terry.

44.     On October 1, 2023, Deborah Terry experienced a change in condition that required transfer to the hospital for evaluation, after which she returned to Meadowview.

45.     An October 11, 2023 "Fall Risk Assessment" scored Deborah Terry at *"5"*.  The "Fall Risk Assessment" documented "[i]f you answered YES to 6 or more questions, the resident is at high risk for falls and fall prevention policy should be implemented."

46.     The "Fall Risk Assessment" reveals multiple assessment errors that would have placed Deborah Terry at a high fall risk, such as:

a.     Does the resident have depression, fatigue, weight loss or insomnia?
The Meadowview staff answered "*no*" despite Deborah Terry's diagnosis of major depressive disorder.

b.     Does the resident have confusion, disorientation, or inability to follow directions?
The Meadowview staff of answered "*no*" despite Deborah Terry's BIMS score of *"8"* which categorized her cognition as *"Moderately Impaired"*.

Case ID: 250500445

47.    The October 2023 "Treatment Administration Record" reveals a "Physician's Order" for "*Weight Monthly every evening shift starting on the 14th and ending on the 14th of every month*" with "*Start Date – 08/14/2020*".

48.    The "Weight and Vitals Summary" documented Debroah Terry's weight as *"446.6 lbs"* via mechanical lift on October 6, 2023.

49.    A "Nutrition Assessment" completed on November 1, 2023 revealed the following information for Deborah Terry:

*Most Recent Weight: 446.6, 10/06/2023, Scale: Mechanical Lift*

*BMI: 72.1*

*Additional Comments: Resident continues on a CCD and NAS, regular, thins diet.  PO intakes good.  NO difficulty noted w/chewing or swallowing current diet.  Able to feed herself.  Weight: 446.6 lbs (10/06), 442.2 lbs (9/7), 430.4 lbs (7/11), 411.2 lbs (4/19). BMI 72.1 kg/m2, Ht: 66 in. Goal for gradual weight loss. Labs reviewed, encourage fluid intakes.  Per wound note, MASD to right upper thigh area and lower back secondary to moisture and skin folds.  R upper thigh 1cm x 1.5cm x 0.1cm 100% macerated epithelial tissues.  Encourage protein intakes at mealtime. Continue with current poc.*

50.    A November 8, 2023 "Progress Note" timed at 17:15 documented a fall for Deborah Terry as:

*Approximately 4:00 PM, nursing staff was transferring resident from Geri chair to bed, via mechanical lift.  Mechanical lift tilted over causing resident to fall on the floor landing on her back.  Resident did not hit her head.  Resident stated "the lift tilted over and I fell onto the floor".  Nursing staff assisted resident off floor back into bed via mechanical lift 650. Nursing completed full body assessment; no injuries noted.  Completed pain assessment; resident c/o pain to LE, pain level 8/10; administered PRN tramadol.  Therapy screen in place. VS; b/p 128/69 HR 62 R-18 SPO2 96% RA, Temp 98.2.  MD made aware and gave orders for STAT X-RAY of LE, orders placed.  Staff educated on proper use of mechanical lift.  Mechanical lift was tagged out to be checked by maintenance and found to be in good working condition. Bariatric mechanical lift added to task bar.  RR made aware.*

51.    The "Incident Report" dated November 8, 2023 documented the following information regarding Deborah Terry's fall:

*Nursing Description: Approximately 4:00PM, nursing staff was transferring resident from Geri chair to bed, via mechanical lift.  Mechanical lift tilted over when staff attempted to turn resident towards the bed and resident's weight shifted causing the lift to tilt over resident to fall on the floor landing on her back.  Resident did not hit her head.  Resident was being transferred by 3 staff members.*

Case ID: 250500445

*Resident Description: Resident stated, "the lift tilted over and I fell onto the floor when they turned me."*

*Immediate Action Taken: Nursing staff assisted resident off floor back into bed via mechanical lift 650. Nursing completed full body assessment; no injuries noted. Completed pain assessment; resident c/o pain to LE, pain level 8/10; administered PRN tramadol. Therapy screen in place. VS; b/p 128/69 HR 62 R-18 SPO2 96% RA, Temp 98.2. MD made aware and gave orders for STAT X-RAY of LE, orders placed. Staff educated on proper use of mechanical lift. Mechanical lift was tagged out to be checked by maintenance and found to be in good working condition. RR made aware. On 11/9/23 resident had increased complaints of pain to her bilateral lower extremities. Dr. Cohen called and ordered xrays. Xray results showed acute impacted supracondylar fracture. Advanced arthritic changes to the hip and knee along with severe osteoporosis.*

*Other Info: Resident is full mechanical lift and has been since admission in 2018. Resident's last weight was 440 lbs. Facility lift capacity is 450 lbs. Resident had large abdominal girth. 3 staff assisted resident with transfer from geri chair into bed when staff turned lift resident shifted her weight in sling causing the lift to tip over and resident fell to the floor. Fall was witness and resident did not hit her head. As demonstrated by staff resident was approximately 2 ½ - 3 feet off the ground. Resident remained in the sling attached to the lift. Several staff members assisted resident off of the floor and into bed. Full body assessment completed.*

*Notes: At baseline resident AAOX4, can make needs known. Resident 2 person assist for ADL'S, care and transfers with use of mechanical lift. Incontinent of b/b. PMH: Obesity, Aphasia, primary osteoarthritis, Rt lower quadrant pain, abnormalities of gait and mobility. On 11/8/23 approximately 4:00 PM nursing staff was transferring resident from Geri chair back into bed when the mechanical lift with 3 staff members when lift tilted, causing resident to fall on the floor, onto her back. resident did not hit her head. Resident stated, "the mechanical lift tilted when they were turning it." Staff called to assist with getting resident off the floor. Resident was observed by supervisor in the mechanical lift with the mechanical lift on its side. Nursing staff assisted resident off floor back into bed, via mechanical lift. Completed a head to toe assessment; no injuries noted. Completed pain assessment; resident c/o pain in LE, pain level 8/10; administered PRN tramadol. Therapy screen in place. VS b/p 129/69 HR 62 R-18 SPO2 96% RA, Temp 98.2. Resident complained of increased pain in morning of 11/9/23 UM notified MD and gave orders for X-ray of LE, orders placed. Staff educated on proper use of mechanical lift. Mechanical lift tagged to be checked; Mechanical lift working properly. Bariatric mechanical lift added to resident task bar. RR aware.*

52.     Deborah Terry's last documented weight on October 6, 2023 was 446.6 pounds, not 440 pounds, as listed in the "Incident Report".

53.     A November 8, 2023 "Progress Note" documented the type of lift involved in Deborah Terry's fall as:

*1/9 S/P Witnessed fall around 4 pm, three staff members were transferring resident then the Hoyer lift tilted over, then resident fell on her back to the floor. Both Supervisors who*

Case ID: 250500445

*were present in the building came to the room and did head to toe assessment on resident, no apparent injuries noted, vitals signs done, WNL, mechanical lift was used by the five nursing staffs to transfer resident to bed.  PRN pain med was administered to resident, positive outcomes noted during the shift, all PO meds and dinner tolerated, call bell within reach and bed in low position.  Resident resting comfortable at this time.*

54.      A November 9, 2023 "Progress Note" documented Deborah Terry voiced complaints of pain as *"resident c/o pain in lower extremities, pain level 8/10 prior to medication administration. MD made aware and gave N/O for STAT X-ray of lower extremities. Orders place. RR aware.  Resident given PRN Tramadol, nursing will continue to monitor."*

55.      A November 9, 2023 "Progress Note" documented the results of Deborah Terry's x-ray as:

*LE X-ray received. Findings; 3 views of the lt femur demonstrate an acute impacted supracondylar fracture.  Advance arthritic changes seen on the hip with circumferential collar osteophyte formation. Advance arthritic changes also seen on the medial and lateral joint compartments of the knee, greatest medially.  Severe osteoporosis is appreciated.  Diffuse soft tissue swelling surrounds the entire femur and knee.  4 views of the bilateral hips and pelvis demonstrate dislocation or obvious hip fracture.  However, CT/MRI may be obtained if occult hip fracture is suspected.  The visualized pelvis is intact.  Advance bilateral arthritic changes are seen of the hips with circumferential collar osteophyte formation.  The sacroiliac joints and pubic symphysis are age appropriate.  No abnormal soft tissue mass or suspicious calcification are seen within the pelvis.  No lytic or blastic lesions are seen.  MD made aware and gave orders to send out to Chestnut Hill Hs.  Orders placed.  Transport scheduled with Life Med, via stretcher. UM placed call to Chestnut Hill ER, gave report to Amy.  RR ware.  Resident belongings will be secured in resident room.*

56.      A November 9, 2023 "Progress Note" documented *"[s]on requested resident to go to Roxborough Memorial Hospital, MD made aware and agreed.  Call placed to RMH, report given to Sandy. Life Med arrived, resident require bariatric stretcher.  Call placed to Life Med, Awaiting Life Med for transportation.  ETA 2-3 hours.  Life Med. Son aware in the building."*

57.      A "Fall Risk Assessment" completed on November 9, 2023 scored Deborah Terry at *"6"* which categorized her as a "high risk for falls and fall prevention policy should be implemented".

58.      A typed note was found in Deborah Terry's Meadowview records documented:

*11/9/2023 S/P fall sustained hip fracture – due to hoyer lift transfer – resident wt 246 – lift 450 lbs – intervention was transfer with 600 lb lift.*

Case ID: 250500445

59.    Deborah Terry was transferred and admitted to the Roxborough Memorial Hospital, with the following documented in the emergency department records:

*Patient is a 70-year-old female presenting from nursing facility, Meadowview complaining of bilateral hip pain left greater than right.  Reportedly, patient was being lifted on a Hoyer lift yesterday when she fell out of the lift striking her left hip. Patient reports positive head strike denies loss of consciousness headache or blood thinner use.  Per reports, it appears that patient may have fractured her left femur per the nursing facility staff reports. However this is unclear.  Other than bilateral hip pain patient without any complaints, denies chest pain abdominal pain fevers chills nausea vomiting or shortness of breath.*

***

*Patient with 2+ DP pulses bilaterally. Patient neurovascular intact about the feet bilaterally.  Range of motion at the hips and knees are limited secondary to pain.*

***

*Attempting to get Xray imaging. But pt is at upper limit of weight limit.*

***

*Xrays show a complex left knee fracture and ?compression of the left fem head, will opt to get CT of the pelvis to rule out any occult pelvis fracture given the habitus and mechanism of the patient's injury.*

***

*CT Knee left without contrast: Acute pathological impaction fracture of the distal femur involving the femoral condyles and distal shaft with oblique posterior 9cm longitudinal fracture of the distal shaft.*

60.    The "History and Physical" dated November 10, 2023 documented the following:

*She reports left lower extremity pain, particularly at the knee; 10/10 in severity, constant, described as aching and dull.*

***

*Xray knee Right: comminuted distal femoral fracture with a joint complex joint effusion.*

***

*CT knee Left: Acute pathologic impaction fracture of the distal femur involving the femoral condyles and distal shaft with oblique posterior 9cm longitudinal fracture of the distal shaft.*

61.    A November 11, 2023 "Orthopedic Consultation" documented:

*Patient with history of hyperlipidemia hypertension obesity atrial fibrillation type 2 diabetes history of CVA she lives at a nursing facility she is nonambulator.  X-rays show*

Case ID: 250500445

*left femur comminuted mildly displaced fracture as well as right femoral mildly displaced impacted fractures.*

*She has severe movement morbid obesity with dysfunctional skin distally bilaterally suggestive of venous statis. She has 4 out of 5 strength distally. Poor pulses poor capillary refill distally no significant calf tenderness. She is nontender on the right and left upper extremities. White count 17.0 hemoglobin 9.7 significant elevated at troponin.*

***

*This is nonsurgical care of this is a nonambulator. This is with nondisplaced bilateral distal femoral fractures she is not amenable to any bracing secondary to morbid obesity. She should be at bedrest as she is with appropriate decubitus precautions.*

62.     Deborah Terry was discharged from Roxborough Memorial Hospital and readmitted to Meadowview on November 13, 2023.

63.     Upon readmission to Meadowview, Deborah Terry's weight on November 13, 2023 was 450.2 pounds.

64.     The negligence, neglect and abuse of Deborah Terry by Defendants, and/or Defendants' agents, and resulting injuries caused a significant decline in Decedent's clinical status.

65.     The severity of the negligence, neglect and abuse inflicted upon Deborah Terry by Defendants' mismanagement, improper under-budgeting, understaffing of the facility and lack of training and/or supervision of the facility's employees, failure to provide adequate and appropriate health care, engaging in incomplete, inconsistent and fraudulent documentation, failure to develop and implement an appropriate care plan, failure to conduct accurate resident assessment, failure to ensure the highest level of physical, mental and psychosocial functioning was attained or maintained and failure to provide appropriate monitoring, supervision, care and services caused Deborah Terry to experience depression, bilateral femur fractures,  loss of dignity, anxiety and conscious pain and suffering, all past, present and future.

66.     As a direct result of the Defendants' negligence, neglect, abuse, carelessness and recklessness herein described, Decedent was caused to suffer serious and permanent injuries as described herein, including bilateral femoral fractures, embarrassment, depression, loss of dignity, anxiety and conscious pain and suffering, all past, present and future.

Case ID: 250500445

## CONDUCT OF THE DEFENDANTS

67.     Plaintiff hereby incorporates by reference the prior paragraphs as if they have been more fully set forth herein.

68.     During the course of her admission, Deborah Terry was incapable of independently providing for all of her daily care and personal needs without reliable assistance.

69.     At all relevant times, the Defendants, through their agents, servants, employees and/or representatives: (a) should have been and/or were aware of Deborah Terry's needs and (b) represented that they could adequately care for her needs.

70.     In exchange for money, Deborah Terry was admitted to the Defendants' care at Meadowview Rehabilitation and Nursing Center to obtain such care and protection.

71.     The Defendants, upon information and belief, were controlled by a board of directors who were responsible for the operation, planning, management and quality control of its facility.

72.     At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Deborah Terry and promised that they would adequately care for her needs, akin to a hospital.

73.     The Defendants were responsible for the operation, planning, management and quality control of its facility.

74.     The control exercised over the Defendants' facility by the Defendants, included: budgeting, marketing, human resource management, training, staffing and the creation and implementation of all policy and procedure manuals used by Meadowview Rehabilitation and Nursing Center.

75.     The Defendants controlled reimbursement, quality care assessment and compliance, licensure, certification, and all financial, tax and accounting issues through control of the fiscal policies of Meadowview Rehabilitation and Nursing Center.

76.     Upon information and belief, the corporate officers of Defendants utilized survey results and quality indicators to monitor the care being provided at their nursing homes, including Meadowview Rehabilitation and Nursing Center.

Case ID: 250500445

77.    Upon information and belief, the Defendants, including their owners, officers, directors, partners, members, managers and employees knew that they had been cited by governmental units regarding Meadowview Rehabilitation and Nursing Center as follows:

*04/13/2018:* it was determined that 3 of 5 treatment carts contained open topical medicines and sterile solutions used for wound care that were not marked with the resident's name and not dated to indicate when the item was opened or when to discard it; and failed to meet the minimum number of general nursing care hours for 5 of 21 days reviewed;

*10/25/2018:* failed to maintain resident dignity during dining for one of 55 residents reviewed; failed to accommodate a resident's needs by failing to ensure facility transportation picked up personal clothing for one of 41 residents reviewed; failed to notify the physician regarding a resident's change in condition for one of 41 residents reviewed; failed to develop an individualized care plan for one of 41 residents reviewed; failed to update/revise comprehensive care plans for three of 41 residents reviewed; failed to provide nursing services consistent with the Pennsylvania Code Title 49 Professional and Vocational Standards, dated October 2007, during observation of medication administration for one of four residents observed; failed to accurately provide reconciliation of all pre-discharge medications with the resident's post-discharge medications in the resident's discharge summary, for one of three closed records reviewed; failed to notify the physician of a change in condition for one of 41 residents reviewed; failed to ensure that adequate assistance was utilized during the transfer of a resident resulting in actual harm of a skin tear requiring 12 sutures for one of 41 residents reviewed and failed to ensure a resident was free of accident hazards regarding the administration of oral glucose and applesauce to an unconscious resident for one of 41 residents reviewed; failed to ensure a resident was free from a potentially significant medication error during observation of medication administration for one of four residents observed; failed to securely store medications in two of five medication carts reviewed; failed to ensure food was stored, prepared, distributed, and served in accordance with professional standards for food service safety; and failed to maintain complete and accurate documentation for one of 41 residents reviewed;

*07/08/2019:* failed to meet the minimum number of general nursing care hours for each 24-hour period as required;

*08/28/2019:* failed to ensure that 9 out of 52 resident reviewed maintained dignity at meal times; failed to post contact information for the State Department of Health, Medicare and Medicaid contact information and information on Resident Rights on five of five nursing units; failed to post survey results on five of five nursing units; failed to obtain and/or clarify life sustaining treatment measures in the electronic health record for four of 52 clinical records reviewed; failed to maintain a clean, comfortable and home like environment for three of five nursing units; failed to post information on how to and who to contact to file a grievance on five of five nursing units; failed to ensure that a baseline care plan was developed and implemented, and that a written summary of the baseline care plan was provided to the resident and/or the resident's representative for two of eight residents reviewed; failed to develop and implement a comprehensive person-centered care plan with measurable objectives and goals related to a resident with an indwelling foley catheter, safety of a resident related to obesity and behaviors for four of 52 residents reviewed; failed to provide showers and grooming for three of 8 residents reviewed; failed to ensure that the one out of 52 residents reviewed received proper foot care; failed to

Case ID: 250500445

provide adequate treatment, assessment and monitoring for the care and maintenance of an intravenous catheter line in accordance with professional standards of practice for one of 52 residents reviewed; failed to administer pain medication in accordance with professional standards of practice, for one of four residents reviewed related to pain management; failed to ensure that a resident's companion staff had the proper training and competency related to feeding one of 52 residents reviewed; failed to post daily nurse staffing data on each unit for all day of the survey on five of five units; failed to use an antipsychotic medication, in accordance with professional standards of nursing for one of one resident who received an intra-muscular injection of an antipsychotic medication; failed to assess a resident for the appropriate textured diet for one of 52 residents reviewed; failed to ensure that each resident received at least three meals daily, at regular times comparable to normal mealtimes in the community for one of two meal cart delivery schedules reviewed; failed to ensure that assistive devices for feeding were provided for one of 52 residents reviewed; failed to ensure that food was stored, prepared, distributed, and served in accordance with professional standards for food service safety; failed to ensure that staff implement infection control measures to prevent facility acquired infections related to storage and processing of linens for the facility; hand washing; medication administration; transmission precautions and the commingling of personal care items for five out of 52 residents reviewed; failed to maintain the walk-in freezer in the main kitchen in a safe operating condition; failed to ensure that handrails were secure and safe in two of five nursing units; and failed to report to the Department of Health an interruption of services due to the malfunction of the air conditioning unit on one out of five nursing units as required;

*10/01/2019:* failed to provide proper supervision to one resident identified as an elopement risk for one of ten residents reviewed; and failed to provide sufficient nursing personnel to meet the state required minimum number of 2.7 per patient day nursing hours as required, for four of 21 days reviewed;

*11/10/2021:* failed to ensure that dignity was maintained for one of 46 residents reviewed; failed to maintain a safe and clean environment for two of five nursing units; failed to complete a thorough investigation related to elopement for two of 37 records reviewed; failed to develop a comprehensive person-centered care plans for two of 37 residents reviewed; failed to ensure that physician's orders were obtained for hospice services for one resident and clarify and implement physician orders related to diabetic medications and monitoring of blood sugars levels for one resident of 46 records reviewed; failed to ensure resident safety for three of 46 residents reviewed related to smoking; failed to maintain clinical records that were complete and accurate for one of 37 residents reviewed; failed to maintain an effective infection control program related to wearing the appropriate personal protective equipment for one of five nursing units reviewed; failed to follow the COVID-19 testing guidelines for staff based on the county level of community transmission of COVID-19 for two of three unvaccinated employees reviewed; and failed to ensure that staff members wore appropriate photo identification (ID) badges as required;

*06/03/2022:* failed to ensure that staff hired as temporary nurse aides demonstrated competency in skills and techniques necessary to care for residents' needs for six of six personnel files reviewed;

*10/06/2022:* failed to report the result of an investigation involving an injury of unknown origin within 5 working days to the State Survey agency for one of nine residents reviewed;

*10/27/2022:* failed ensure that physician's orders related to the resident's wishes for advance directives was honored in a timely manner for one of 38 sampled resident reviewed; failed to prevent resident to resident physical abuse between three residents

Case ID: 250500445

which resulted in actual harm to a resident who sustained a scratch under the left eye, chin and right arm, a resident who sustained a scratch to left side of nose, gums, and bottom lip and a resident who sustained a bruised forehead and a bruised right eye and lip for three of 38 residents reviewed; failed to report an alleged violation involving resident to resident abuse for one of 38 sampled residents reviewed; failed to conduct a complete investigation to rule out neglect related to an unplanned discharge for one of three closed clinical records reviewed;  failed to revise the resident's care plan related to tube feeding management and tracheostomy care for one of one resident reviewed receiving enteral nutrition; failed to ensure adequate supervision related to a leave of absence and behaviors for one of 38 residents reviewed; failed to provide appropriate care and services for one resident with tracheostomy for one of two residents reviewed with tracheostomy care; failed to implement non-pharmacological interventions and assess and monitor pain management in accordance with professional standards for two of 38 residents reviewed; failed to ensure that three residents who were diagnosed with dementia were provided timely interventions to ensure their safety after displaying aggressive behavior which resulted in actual harm to a resident and two residents sustained multiple scratches on their faces and one resident sustained a bruise forehead and a bruise right eye and lip for three of 38 residents reviewed; failed acquire medications from the pharmacy in a timely manner for one of 38 residents reviewed; failed to ensure that the medication error rate was less than five percent for two of five residents observed during medication administration; failed to provide routine dental services for one of two residents reviewed for dental needs; failed to ensure that foods were stored in accordance with professional standards for food service safety; failed to ensure that garbage and refuse was disposed of properly in the Food Service Department's receiving area; failed to maintain a sanitary, functional, and comfortable environment one of five nursing units observed; and failed to obtain the Department of Health's permission prior to removing licensed beds from two rooms;

*12/05/2022:* the facility did not maintain an adequate pest control program related to flies for one of five units reviewed;

*08/31/2023:* failed to develop and implement comprehensive person-centered care plans related to a diagnosis of Post Traumatic Stress Disorder, and communication for two of 38 residents reviewed; failed to ensure that oxygen therapy was administered per physician's orders for one of 38 residents reviewed; failed to implement psychiatry recommendations for one of three residents reviewed; failed to ensure that all drugs and biologicals used in the facility were dispose and properly stored in a locked medication room and in accordance with professional standards on two of five nursing units; failed to provide a scoop dish and built-up utensils for one out of 38 residents reviewed; failed to provide foods that were palatable, attractive, and at safe and appetizing temperatures on the main dining room; failed to ensure that dishes were cleaned under sanitary conditions in accordance with professional standards for food service safety; failed to ensure complete and accurate documentation were maintained related to resident refusal and weights were for two of 35 residents reviewed; and failed to maintain an effective pest control log on three of five nursing units;

*09/12/2023:* failed to ensure that the resident was provided care and services related to follow up medical appointments for surgery clearance as recommended for one of four clinical records reviewed; and failed to maintain a clean, safe and functional environment for residents and staff in four of five central bathing rooms and in the boiler room;

*01/05/2024:* failed to ensure that one of four residents reviewed was free from verbal, physical and psychological abuse from a nursing staff which resulted in an immediate jeopardy situation for one resident who was rough handled, yelled at with the use of profane

Case ID: 250500445

language, struck in the chest sustaining injuries to the fourth finger on the right hand and chest area and demonstrated signs of fear when approached by nursing staff; failed to ensure residents were protected from verbal, physical and psychological abuse from a nursing staff for one of four residents reviewed which resulted in an immediate jeopardy situation for one resident;

*05/10/2024:* failed to maintain appropriate supervision for two of three residents reviewed;

*06/10/2024:* failed to maintain a safe, clean, homelike environment on three of five nursing units shower rooms; failed to ensure a resident was free from misappropriation related to missing medication for one of 35 residents reviewed; failed to conduct a complete and thorough investigation of an alleged violation for one of 35 residents reviewed; failed to develop a baseline care plan for a newly admitted residents with history of drug abuse for one of 35 residents reviewed; failed to ensure a comprehensive resident care plan was developed and implemented related to adaptive equipment required for swallowing liquids properly and failed to implement care and services identified on a comprehensive care plan regarding unwanted behaviors and mealtime for two of 35 residents reviewed; failed to ensure care and services were provided in accordance with professional standards of practice for one of 35 residents reviewed regarding proper medication order; failed to ensure that physician orders were followed related to insulin for two residents and adaptive equipment for one resident of 35 residents reviewed; failed to implement treatment and services to prevent pressure ulcers for two of 35 sampled residents reviewed; failed to ensure that a resident with limited range of motion, received appropriate services to prevent further decline in range of motion and maintain appropriate positioning for one of 35 resident s reviewed; failed to ensure accurate accounting of controlled drugs for one of three medication storage rooms reviewed; failed to ensure that residents' drug regimen were free of unnecessary drugs related to the use of antipsychotic medication without adequate monitoring for one of five resident reviewed for drug regimen; failed to provide accurate meal trays for one of two residents and failed to provide food products based on the resident's food preference for three of 35 residents; failed to establish and maintain an infection prevention and control program to provide a safe, sanitary and comfortable environment and to help prevent the development and transmission of multidrug-resistant organism  transmission for three residents with indwelling medical devices and hand hygiene for one resident during medication administration of 35 residents records reviewed; and failed to maintain an effective antibiotic stewardship program that includes a system that includes antibiotic use protocols and a system to effectively monitor antibiotic usage for three of four months of antibiotic stewardship program data reviewed;

*12/05/2024:* failed to provide a minimum of one nurse aide per 10 residents during the day, failed to provide one nurse aide per 11 residents during the evening shift and failed to provide one nurse aide per 15 residents on the night shift for three of three weeks reviewed; failed to provide a minimum of 1 licensed nurse per 25 residents during the day shift, 1 LPN per 30 residents during the evening shift, and 1 LPN per 40 residents on the night shift for three of three weeks reviewed; and failed to provide a minimum of 3.2 PPD (per patient daily) hours of direct resident care for each resident for 19 of 21 days reviewed;

*02/26/2025:* failed to maintain required staffing ratios, including one nurse aide per 10 residents during the day shift, one nurse aide per 11 residents during the evening shift and one nurse aide per 15 residents during the overnight shift, on 11 of 21 days reviewed; failed to maintain required staffing ratios, including one LPN per 25 residents during the day shift, one LPN per 30 residents during the evening shift, and one LPN per 40 residents during the overnight shift on 7 of 21 days reviewed; and failed to provide a minimum of

Case ID: 250500445

3.2 hours of direct resident care for each resident in a 24 period for 11 out of 21 sampled days;

*04/11/2025:* failed to ensure that an appropriate discharge was documented in the resident's clinical record for one of four closed records reviewed; and failed to notify the Office of the State Long-Term Care Ombudsman of facility-initiated transfers to the hospital and that a resident's representative was made aware of a facility-initiated transfer in writing, for one of four clinical records reviewed; the Preadmission Screening and Resident Review was not appropriately completed according to the resident assessment for one of five residents reviewed; failed to developed a comprehensive care plan with measurable objectives for a resident who exhibited aggressive behaviors towards other residents for one of 35 clinical records reviewed; failed to revise a resident's care plans, related to accuracy of information, for one of 35 residents reviewed; failed to administer medication as ordered by the physician for one of 35 residents reviewed; failed to make certain the highest practicable level of pain management was maintained for two of 35 residents reviewed; failed to provide food and drink that was palatable and served at palatable temperatures for eight of 35 residents reviewed; failed to ensure that the recommended therapeutic diet was provided to a resident for 1 out of 35 residents reviewed; failed to ensure a resident had the capacity to understand the terms of a binding arbitration agreement for one of three residents reviewed; and failed to ensure that a physician's discharge summary was completed within 30 days of discharge for one of four closed records;

*07/31/2025:* failed to provide a minimum of 3.2 hours of direct resident care for each resident in a 24 hour period for 6 out of 7 sampled days; and

*08/28/2025:* failed to follow physician orders for one of eight residents' clinical records reviewed.

78.     As a direct and proximate result of the Defendants' acts and omissions, and their breach of their duty of care, negligence, carelessness and recklessness, Decedent suffered (a) severe permanent physical injuries resulting in pain, suffering, and disfigurement, past, present and future; (b) mental anguish, embarrassment, humiliation, degradation, emotional distress and loss of personal dignity, past present and future; (c) loss of capacity for enjoyment of life, past, present and future; and (d) expense of otherwise unnecessary hospitalizations and medical care, past, present and future.

79.     In causing the aforesaid injuries, the Defendants knew, or should have known, that Deborah Terry would suffer such harm.

80.     The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Deborah Terry.

81.    At all relevant times, the Defendants, individually, and/or through their agents, servants and employees, assessed the needs of Deborah Terry and promised that they would adequately care for her needs, akin to a hospital.

82.    At all relevant times, the Defendants made a conscious decision to operate and/or manage their facility so as to maximize profits at the expense of the care required to be provided to their residents, including Deborah Terry.

83.    In their efforts to maximize profits, the Defendants reduced staffing levels below the level necessary to provide adequate and timely care and services to their residents, including Deborah Terry.

84.    Upon information and belief, the Defendants caused staffing levels at their facility to be set at a level such that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned residents, including Deborah Terry.

85.    Upon information and belief, the Defendants intentionally increased the number of sick and frail residents with greater health problems requiring more complex care.

86.    The Defendants knew that the increase in the acuity care levels of the resident population would substantially increase the need for staff, services and supplies necessary for the resident population.

87.    The Defendants failed to provide the resources necessary, including sufficient staff, services and supplies, to meet the needs of their residents, including Deborah Terry.

88.    The Defendants negligently, carelessly and recklessly caused the healthcare providers, nurses and nurses' aides who they placed and/or staffed at their facility to be so unqualified and/or under-trained, that the personnel on duty at any given time could not and did not reasonably and timely tend to the needs of their assigned residents, including Deborah Terry.

89.    The aforementioned acts and omissions directly caused and/or increased the risk of the injuries and harm to Deborah Terry and were known by the Defendants.

90.    At all relevant times, the facility was individually owned, and/or in concert owned, possessed managed, controlled, operated and maintained under the exclusive control of the Defendants.

Case ID: 250500445

91. At all relevant times, the Defendants were operating individually or through their managers, members, partners, officers, agents, servants and employees who had actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of the Defendants.

92. The aforementioned injuries, acts and omissions were caused solely and exclusively by reason of negligence, carelessness and recklessness of the Defendants, and their agents, servants and employees and were due in no part to any act or omission to act on the part of Deborah Terry.

93. The Defendants exercised complete and total control over the total and complete healthcare of all the residents of the facility, including Deborah Terry, akin to a hospital.

## COUNT I – NEGLIGENCE

### DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY

**v.**

**WM OPERATING, LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER, WM HOLDINGS, LLC, PREMIER HEALTHCARE MANAGEMENT, LLC, JONATHAN BLEIER, JACOB SOD and JOHN DOES 1-4 (Fictitious Defendants)**

94. Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint, as though same were fully set forth at length herein.

95. Upon accepting Deborah Terry as a resident at their facility, the Defendants, individually, and jointly, assumed direct duties to provide her with adequate, timely and appropriate healthcare and other basic custodial services as set forth herein.

96. The Defendants had the ultimate responsibility to ensuring that the rights, safety, welfare and well-being of their residents, including Deborah Terry, were protected.

97. The Defendants owed the duties to provide adequate, timely and appropriate healthcare and related skilled nursing, custodial, restorative, therapy and rehabilitation care and services to their residents, including Deborah Terry, such as reasonable caregivers would provide under similar circumstances.

98.    The Defendants each owed a duty to their residents, including Deborah Terry, to hire, train oversee and supervise their employees to ensure that their facility was operated and services were provided to their residents in a safe and reasonable matter.

99.    The Defendants each owed a duty and responsibility to furnish Deborah Terry with appropriate, timely and competent medical, nursing and custodial care and services.

100.    The Defendants each owed and failed to fulfill the following duties and responsibilities to Deborah Terry:

i)    The duty to use reasonable care in the maintenance of safe and adequate facility;

ii)    The duty to select, hire, train and retain only competent staff;

iii)    The duty to oversee, monitor and supervise all persons who practice nursing and/or medical healthcare within their facility;

iv)    The duty to staff their facility with sufficient and adequately trained personnel to provide the care and services required by their facility's residents;

v)    The duty to maintain sufficient staffing, funding, supplies and resources for the facility to meet the needs of their facility's residents;

vi)    The duty to formulate, adopt, oversee, revise and enforce rules, policies, procedures and protocols to ensure quality of care for all their facility's residents;

vii)    The duty to take adequate, timely and appropriate measures to correct the known problems with quality of care, as well as the known problems with the delivery of medical, nursing and custodial care and services;

viii)    The duty to keep their facility's residents free and safe from abuse and neglect;

ix)    The duty to provide safe, decent and clean environment for their facility's residents; and

x)    The duty to warn their facility's residents, as well as their families and/or responsible parties, of the Defendants' inability to provide adequate, timely, appropriate and safe care and services when the Defendants were placed on notice, knew, or should have known, of the deficiencies in providing such care and services to and for their residents.

101.    In addition to the direct acts and omissions of the Defendants, the Defendants also acted through their agents, servants, officers and employees, who were in turn acting within the course and scope of their employment, in furtherance of the Defendants' business and under the direct control and supervision of the Defendants.

102.    All of the acts alleged to have been done or not to have been done by the Defendants were done or not done by said Defendants, their agents, ostensible agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said Defendants and failed or refused to act with reasonable care in the following manner:

a.    negligently overloading the Hoyer Lift during mechanical lift transfer of Deborah Terry;

b.    failing to safely transfer Deborah Terry via mechanical lift;

c.    causing mechanical lift to tilt due to excessive weight capacity;

d.    causing Deborah Terry to fall from the mechanical lift to the floor;

e.    causing bilateral femur fractures;

f.    failing to make the appropriate, thorough and timely assessment of Deborah Terry's condition;

e.    failing to seek timely medical care when Deborah Terry's condition required same;

f.    failing to properly train and supervise Defendants' actual or ostensible employees, servants, agents or other staff or healthcare providers to monitor Deborah Terry and to provide for her safety, welfare and general well-being;

g.    failing to properly hire, train and supervise staff, employees and healthcare providers at Defendants' facility;

h.    failing to monitor the competency, adequacy and propriety of the treatment rendered by their agents, servants and employees who provided care and treatment to Deborah Terry while a resident at Defendants' facility;

i.    failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's residents, including Deborah Terry, were properly supervised, assessed, monitored and received proper and timely medical, custodial and nursing care;

j.    failing to maintain Defendants' duty to formulate, adopt and enforce adequate policies, procedures and protocols to ensure that their facility's residents, including Deborah Terry, are properly supervised, monitored and receive proper medical, custodial and nursing care to keep her free from falls;

k.    failing to administer the facility in a manner that enabled it to use its resource effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of the facility's residents, including Deborah Terry;

l.    failing to ensure that the Defendants used the results of its assessments to develop, review and revise Deborah Terry's "Care Plan";

m.    failing to ensure that Defendants' facility had sufficient nursing staff to provide nursing and custodial care and services to the residents in order to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident, including Deborah Terry;

Case ID: 250500445

n.  failing to maintain compliance with the governmental rules and regulation to which Defendants' delivery of care is compared as part of the survey process conducted by the Pennsylvania Department of Health;

o.  failing to provide adequate and sufficient staffing levels at Defendants' facility;

p.  failing to properly select, retain and monitor the competency of the medical and nursing staff, their employees, agents, servants and other healthcare providers who treated Deborah Terry and failing to ensure such persons provided care within the applicable standards of care;

q.  failing to keep Deborah Terry free from neglect and abuse;

r.  failing to take appropriate steps to remedy continuing problems at the Defendants' facility that Defendants knew, or had reason to know, were occurring with Deborah Terry's care, which included the need to increase the number of the facility's employees, hiring skilled and trained employees, adequately train and supervise the current employees, monitoring conduct of the employees, and adopting new or changing the existing policies, procedures and protocols to ensure care provided was provided within the appropriate community standards;

s.  making false, fraudulent, inadequate and inconsistent notes in Deborah Terry's chart;

t.  failing to obtain new or modified "Physicians' Orders" when changes in Deborah Terry's condition were recognized by Defendants' agents;

u.  failing to accurately, timely and consistently document Deborah Terry's needs and the care and services provided to her in response to such needs;

v.  violating Pennsylvania Statutes, Pennsylvania Administrative Regulations, as well as OBRA regulations;

w.  grossly understaffing Defendants' facility;

x.  failing to train the employees to recognize medical conditions/symptoms which required Deborah Terry's transfer to the hospital;

y.  failing to allocate adequate funds, resources and supplies and failure to implement a facility budget that provided for the necessary and sufficient funds, resources and staffing levels to enable and allow their facility to provide adequate, timely appropriate care and services to the facility's residents, including Deborah Terry;

z.  failing to recognize and investigate neglect and abuse occurring with the care and services provided and not provided to Deborah Terry, and failure to report such neglect and abuse to the appropriate governmental agencies;

aa.  all of the acts or failure to act constitute a deviation from the appropriate standards of care, negligence, carelessness and reckless indifference to the health, safety, welfare and well-being of Deborah Terry;

bb.  Defendants' conduct caused harm to Deborah Terry and increased the risk of harm to her; and

cc.  in committing the aforementioned acts and omissions, Defendants were acting negligently, carelessly and with reckless indifference to the safety, welfare and well-being of Deborah Terry.

Case ID: 250500445

103.    Upon information and belief, the Defendants, including their owners, members, managers, officers, directors and partners knew of and/or were made aware of the Pennsylvania Department of Health annual and complaint survey results and placed on notice of the status of their nursing home, Meadowview Rehabilitation and Nursing Center.

104.    At all times relevant to this lawsuit, the Defendants employed and directed physicians, nurses, and other medical personnel who rendered care to Deborah Terry.

105.    At all times relevant to this lawsuit, the Defendants owed a duty to Deborah Terry to provide competent and qualified physicians, surgeons, nurses, nurses' aides and other medical and quasi medical personnel to render proper care to Deborah Terry.

106.    At all times relevant to this lawsuit, the Defendants owed Deborah Terry the duty to operate their nursing home facility in a careful and reasonable manner, under the circumstances, as would have been done by other nursing homes in and about the Pennsylvania area.

107.    At all times relevant to this lawsuit, Defendants and their agents, staff and employees, owed Deborah Terry the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar nursing homes, physicians and/or nurses in and about the Pennsylvania area.

108.    At all times relevant hereto, Deborah Terry's care was to be delivered and administered by medical staff, nursing staff and healthcare staff at the Defendants' nursing home in a reasonably safe and prudent manner within the applicable standards of care for the community, as well as state and federal nursing home facility rules and regulations.

109.    Deborah Terry was a resident at Defendants' nursing home and the Defendants negligently and carelessly and in wanton and willful disregard for her health, safety and general welfare, inflicted injury upon her in failing to timely provide appropriate and necessary medical, nursing and custodial care, adequate monitoring and supervision.

110.    As a direct and proximate result of the negligence, carelessness and recklessness of the Defendants, as is more fully set forth herein, Deborah Terry experienced improper mechanical lift transfer

which resulted in bilateral femur fractures, embarrassment, depression, loss of dignity, anxiety and conscious pain and suffering, all past, present and future.

111.    Deborah Terry suffered, and continues to suffer severe, conscious and excruciating pain and continuous suffering, both physical and mental, past, present and future, all the result of the aforesaid negligent, careless and reckless conduct of the Defendants, and Defendants ' agents, and their breach of the duty of care as set forth herein.

112.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Deborah Terry would suffer such harm.

113.    Pennsylvania Code Chapter 28, Section 201 *et. seq.*, requires that Defendants comply with all federal, state and local regulations with regard to long-term care facilities.

114.    The Defendants violated OBRA regulations, which establish the minimum standard of care to be followed by Defendants, including but not limited to the following:

(A)    42 C.F.R. § 483.10 (a)(1) / § 483.10 the resident has a right to a dignified existence;

(B)    42 C.F.R. § 483.12 / § 483.13 (b) & (c) the resident has the right to be free from abuse, neglect, misappropriation of resident property, and exploitation as defined in this subpart;

(C)    42 C.F.R. § 483.12 (c)(1) / § 483.13(c)(2) the facility must ensure that all alleged violations involving abuse, neglect, exploitation or mistreatment, including injuries of unknown source and misappropriation of resident property, are reported immediately, but not later than 2 hours after the allegation is made, if the events that cause the allegation involve abuse or result in serious bodily injury, or not later than 24 hours if the events that cause the allegation do not involve abuse and do not result in serious bodily injury, to the Administrator of the facility and other officials (including to the State Survey Agency and adult protective services where state law provides for jurisdiction in long-term care facilities) in accordance with state law through established procedures;

(D)    42 C.F.R. § 483.20 (2)(ii) the facility must conduct an assessment after a significant change in resident's condition;

(E)    42 C.F.R. § 483.21 (b) / § 483.20(k) Comprehensive Care Plans, the facility must develop and implement a comprehensive person-centered care plan for each resident, consistent with the resident rights, that includes measurable objectives and timeframes to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment;

(F)    42 C.F.R. § 483.24 / § 483.25 each resident must receive, and the facility must

Case ID: 250500445

provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, consistent with the resident's comprehensive assessment and plan of care;

(G)    42 C.F.R. § 483.25 (d)(2) / § 483.25 (h)(2) each resident receives adequate supervision and assistance devices to prevent accidents:

(H)    42 C.F.R. § 483. 35 (a) / § 483. 30(a)(1) the facility must provide services by sufficient number of each of the following types of personnel on a twenty-four (24) hour basis to provide nursing care to all residents in accordance with resident care plans; and

(I)    42 C.F.R. § 483.70 (b) / § 483.75 (b) the facility must operate and provide services in compliance with all applicable federal, state, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in such a facility.

115.    Deborah Terry fell within the class of persons the statutory rules, regulations and laws that were intended to protect by virtue of OBRA Regulations and the Pennsylvania Code 28 §§ 201, *et. seq.*, thus entitling the Plaintiff to adopt such laws as the standard of care for measuring the Defendants' conduct. Thus, Plaintiff asserts a claim for negligence *per se*, asserting that, as a matter of law, the conduct of the Defendants amounted to negligence and negligence *per se*.

116.    At all relevant times pertinent hereto, there was in full force and effect 18Pa.C.S.A. § 2713 "Neglect of Care Dependent Person", providing penal consequences for neglect of a care-dependent person for:

*Intentionally, knowingly or recklessly causes bodily injury or serious bodily injury by failing to provide treatment, care, goods or services necessary to preserve the health, safety or welfare of a care-dependent person for whom he is responsible to provide care.*

117.    18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" expresses the fundamental public policy of the Commonwealth of Pennsylvania that older adults, like children, are not to be abused or neglected, particularly in health care facilities or by persons holding themselves out as trained professionals, and that if such neglect or abuse causes injury, either physical or mental, then such conduct is actionable.

118.    At all relevant times pertinent thereto, Deborah Terry was a care-dependent resident of the Defendants' facility and as such, fell within the class of persons 18 Pa.C.S.A. §2713 "Neglect of Care

Case ID: 250500445

Dependent Person" was intended to protect, and as such, entitling Plaintiff to adopt 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" as the standard of care for measuring the conduct of the Defendants.

119.    Furthermore, 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" is directed to obviate the specific kind of harm which Deborah Terry sustained, with its purpose, at least in part, to protect the interest of a group of individuals, i.e., *care-dependent persons*, including Deborah Terry.

120.    The Defendants, accepted the responsibility for providing for Deborah Terry's care, welfare and well-being, as mentioned herein, and were negligent *per se* as they violated 18 Pa.C.S.A. § 2713 "Neglect of Care Dependent Person" in that they failed to provide treatment, care, goods and services necessary to preserve the health, safety or welfare of Deborah Terry, for whom they were responsible to provide care as specifically set forth in this Complaint.

121.    The conduct of the Defendants was intentional, outrageous and willful, and exhibited a reckless indifference to the health, safety and well-being of Deborah Terry.

122.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT II –  VICARIOUS LIABILITY

**DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY**

**v.**

**WM OPERATING, LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER, WM HOLDINGS, LLC, PREMIER HEALTHCARE MANAGEMENT, LLC, JONATHAN BLEIER, JACOB SOD and JOHN DOES 1-4 (Fictitious Defendants)**

123.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

124.    At all times relevant hereto, the Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants and/or employees of Defendants' nursing facility.

Case ID: 250500445

125.    The Defendants are vicariously liable for the acts, commissions or omissions, of their physicians, nurses, nurses' aides and other medical personnel and healthcare providers fully as though the aforementioned physicians, nurses, nurses' aides and other medical personnel and healthcare providers performed the acts or omissions themselves. In the alternative, the Defendants are responsible for the negligent acts or omissions of other physicians, nurses, nurses' aides and other healthcare providers who are agents, servants and/or employees of the Defendants.

126.    At all times relevant to this lawsuit, the Defendants, employed and directed physicians, nurses, nurses' aides and other medical personnel who rendered care to Deborah Terry.

127.    At all times relevant to this lawsuit, the Defendants owed a duty to Deborah Terry to provide competent and qualified physicians, surgeons, nurses and other quasi-medical personnel to render care to her.

128.    At all times relevant to this lawsuit, the Defendants owed to Deborah Terry the duty to operate their nursing home facility in a careful and reasonable manner, under the circumstances, as would have been done by other nursing homes in and about the Pennsylvania area.

129.    At all times relevant to this lawsuit, the Defendants and their agents, owed Deborah Terry the duty to possess and exercise that degree of skill and knowledge ordinarily possessed and exercised by similar nursing homes, physicians and/or nurses in and about the Pennsylvania area.

130.    At all times relevant to this lawsuit, Deborah Terry's care was to be delivered and administered by the agents, servants and/or employees of the Defendants at the Defendants' nursing home facility in a reasonably safe and prudent manner within the applicable standards of care for the community Commonwealth of Pennsylvania and federal nursing home facility rules and regulations.

131.    The Defendants breached their duties and were, therefore, negligent, careless and exhibited a reckless disregard to the health, safety, welfare and well-being of Deborah Terry.

132.    The aforesaid breaches of duties, negligence, carelessness and recklessness of the Defendants directly and proximately caused the aforesaid injuries to Deborah Terry, and specifically,

Case ID: 250500445

bilateral femur fractures, embarrassment, depression, loss of dignity, anxiety and conscious pain and suffering, all past, present and future.

133.    In causing the aforesaid injuries, the Defendants knew, or should have known, that Deborah Terry would suffer such harm.

134.    The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health, safety and well-being of Deborah Terry.

135.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against the Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

## COUNT III – CORPORATE LIABILITY

### DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY

**v.**

### WM OPERATING, LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER, WM HOLDINGS, LLC, PREMIER HEALTHCARE MANAGEMENT, LLC, JONATHAN BLEIER, JACOB SOD and JOHN DOES 1-4 (Fictitious Defendants)

136.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

137.    Defendants' agents, employees, and servants and others provided care and treatment to Deborah Terry as agents, employees, servants, officers or directors of Defendants or apparent agents held out as such.

138.    At all times relevant hereto, Defendants' agents, servants, employees and others were acting in the scope of their employment as agents, servants, or employees of said Defendants.

139.    At all relevant times pertinent hereto, the corporate conduct of the Defendants was independent of the negligent conduct of the employees, and was outrageous, willful, and wanton, and exhibited a reckless indifference to the health, welfare and well-being of Deborah Terry.

Case ID: 250500445

140.    Defendants, as corporate entities, are liable based on the following duties of care owed to Deborah Terry:

a)    a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
b)    a duty to select and retain only competent physicians;
c)    a duty to oversee all persons who practice medicine within its walls as to patient care; and
d)    a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

141.    Defendants owed Deborah Terry a duty concerning the care and treatment under a corporate negligence standard with regard to the policies, actions and inactions of the institution itself and are directly liable for their own negligence.

142.    Defendants and their corporate members, managers, partners, owners, and directors breached their duties and were, therefore, negligent, careless and reckless in their duties and obligations to Deborah Terry.

143.    The aforesaid breaches of duties, corporate negligence, carelessness and recklessness of Defendants directly and proximately caused the aforesaid injuries to Deborah Terry, including, but not limited to, bilateral femur fractures, embarrassment, depression, loss of dignity, anxiety and conscious pain and suffering, all past, present and future.

144.    In causing the aforesaid injuries, Defendants knew, or should have known, that Deborah Terry would suffer such harm.

145.    The conduct of the Defendants was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health, safety and well-being of Deborah Terry.

146.    The conduct of the Defendants was such that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against all Corporate Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

Case ID: 250500445

**COUNT IV- BREACH OF FIDUCIARY DUTY**

**DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY**

**v.**

**WM OPERATING, LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER**

147.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

148.    At all times material and relevant hereto, Deborah Terry was incapable of dealing with the facility, Meadowview Rehabilitation and Nursing Center, on equal terms, and was incapable of engaging in any arm's length relationship with them.

149.    Additionally, at all times material and relevant hereto, Deborah Terry was incapable of independently providing for her own safety, health, welfare and well-being and justifiably relied on the facility to provide necessary care and services to attain and/or maintain her highest practicable physical, mental and psychosocial well-being.

150.    At all times material and relevant hereto, the facility individually and/or collectively fostered and forged a relationship of special confidence and trust with Deborah Terry by admitting her into their care on  February 7, 2018 and by reserving the right to specifically determine the level of care, safety, protection, services and supplies that would be provided to Deborah Terry.

151.    At all times material and relevant hereto, the facility, individually and/or collectively, controlled and oversaw every single aspect of Deborah Terry's existence, including her activities of daily living, custodial care, as well as skilled nursing and healthcare.

152.    At all times material and relevant hereto, the facility, individually and/or collectively, determined and orchestrated the most trivial, as well as the most vital, aspects of Deborah Terry's existence, from the type of clothing she wore, to when and how she received healthcare, as well as quality and quantity of food and water she could consume.

Case ID: 250500445

153.    As a result, Deborah Terry was solely and entirely dependent upon the facility's staff, employees, agents, officers, and directors, to provide for her basic daily care, skilled nursing and healthcare, services, safety, protection, well-being and personal and intimate needs.

154.    Deborah Terry reposed a special confidence into the facility's staff, employees, agents, officers and directors to provide her with necessary care and services to attain and/or maintain her highest practicable physical, mental, and psychosocial well-being.

155.    At all times material hereto, the facility developed a special relationship with Deborah Terry by virtue of the type of the care and services she required, their supposedly superior knowledge, skill and expertise, and their overmastering dominance over Deborah Terry and by virtue of Deborah Terry's weakness, dependence and inability to independently provide for her own safety, health, welfare and well-being and her justifiable reliance on the facility to provide for her safety, health, welfare and well-being.

156.    In their special relationship with one another, Deborah Terry, a vulnerable and dependent individual, did not and could not deal with the facility on equal terms due to the facility's overmastering dominance on one side, and due to Deborah Terry's weakness and justifiable trust on another side.

157.    At all times material hereto, Deborah Terry entrusted her care, treatment, as well as every single aspect of her very existence into the exclusive care, custody and control of the facility and its staff, employees, agents, officers and directors.

158.    At all times material hereto, the aforementioned special relationship enabled the facility to occupy a position of confidence regarding Deborah Terry requiring fidelity, loyalty and scrupulous fairness and good faith on the part of the facility.

159.    The aforementioned special relationship further required the facility to refrain from using its position to Deborah Terry's detriment and the facility's own advantage.

160.    As such, and at all times material hereto, the facility, Meadowview Rehabilitation and Nursing Center, was a fiduciary of Deborah Terry.

161.    At all times material hereto, the facility owed a fiduciary duty to Deborah Terry.

162.    The facility breached its fiduciary duty and its fiduciary obligations, as well as violated

Case ID: 250500445

their relationship of trust and special confidence owed to Deborah Terry by: a) engaging in the conduct set forth in detail in the within Complaint; and b) allowing revenues, profits and assets obtained from the facility's residents as well as their payor sources for inflated, improper and unreasonable inter-company fees and transfers designed and created for the benefit of the facility's owners, parent companies, affiliates and the Defendants herein, instead of utilizing said resources effectively and efficiently in order to maintain and/or attain the highest practicable physical, mental and psychosocial well-being of the facility's residents, including Deborah Terry.

163.    In their dealings with Deborah Terry, as described herein, the facility acted in bad faith, and used its position of trust and special confidence to their own advantage and to Deborah Terry's detriment.

164.    In violating their fiduciary duties and obligations to Deborah Terry, the facility knew, or should have known, that Deborah Terry would suffer harm.

165.    The conduct of the facility was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare and well-being of Deborah Terry.

166.    The conduct of the facility was such, that an award of punitive damages is justified.

**WHEREFORE,** Plaintiff demands judgment in her favor and against Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

### COUNT V – CORPORATE DEFENDANTS AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

**DEBORAH TERRY, by her Attorney-in-Fact, DAVID TERRY**

**v.**

**WM HOLDINGS, LLC, PREMIER HEALTHCARE MANAGEMENT, LLC, JONATHAN BLEIER, JACOB SOD and JOHN DOES 1-4 (Fictitious Defendants)**

167.    Plaintiff incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint as though same were fully set forth at length herein.

Case ID: 250500445

168.    The Defendants knew, or should have known, of Deborah Terry's fiduciary relationship with the facility, Meadowview Rehabilitation and Nursing Center, by virtue of the type of the care and services she required, their supposedly superior knowledge, skill and expertise, and their overmastering dominance over Deborah Terry, and by virtue of Deborah Terry's weakness, dependence and inability to independently provide for her own safety, health, welfare and well-being and her justifiable reliance on the facility to provide for her safety, health, welfare and well-being.

169.    The Defendants knowingly participated in and provided substantial assistance and encouragement to the facility in connection with the facility's breach of their fiduciary duties and obligations to Deborah Terry, as set forth in detail in Count IV of this Complaint.

170.    The Defendants knew, or should have known, that the facility's residents, including Deborah Terry, were incapable of independently providing for their own care, safety, and well-being, and were justifiably relying on and solely depending upon the facility's staff, employees, agents, officers and directors to provide for their basic daily and custodial care, skilled nursing and healthcare services, safety, welfare and well-being.

171.    Additionally, the Defendants knowingly assisted, encouraged, aided and abetted the facility in its breach of fiduciary duties and obligations to the facility's residents, including Deborah Terry, by: a) engaging in the conduct set forth in detail in this Complaint; b) exercising complete and total control over the facility's revenues by regularly and repeatedly sweeping nearly all of the facility's revenues into corporate account under exclusive control of the Corporate Defendants and/or their designee; c) knowingly and intentionally creating and accepting inter-company fees and transfers consisted of revenues derived from the facility's residents and their payor sources, and designed to improperly and unjustly enrich the Corporate Defendants, instead of allowing the facility to utilize its resources effectively and efficiently to allow the facility's residents, including Deborah Terry, to attain and/or maintain their highest practicable physical, mental and psychosocial well-being; d) structuring the managing and operating business model for the facility in such a way that constrained the facility's ability to provide the adequate and necessary care and services to their residents, including Deborah Terry while simultaneously benefiting and enriching

Case ID: 250500445

the pyramid structure corporate entities; e) overseeing, managing, and controlling the facility's acceptance of reimbursement from residents, including Deborah Terry, knowing that the facility could not provide full value of the care and services to meet the care and safety needs of their residents, including Deborah Terry; f) drafting, structuring and approving contracts between the facility and Defendants, which the Defendants knew, or should have known, would result in diversion and depleting of the facility revenues, necessary to provide the care and services to and meet the needs of their residents, including Deborah Terry.

172.    The aforementioned conduct of the Defendants constitutes knowing and intentional aiding and abetting the facility's breach of their fiduciary duties and obligations to the facility residents, including Deborah Terry, and subjects the Defendants to liability for the injuries and harm suffered by Deborah Terry, as aforesaid.

173.    In adding and abetting the facility in their breach of fiduciary duties and obligations to Deborah Terry, as aforesaid, the Defendants knew, or should have known, that Deborah Terry would suffer harm.

174.    As a result of the Defendants' aiding and abetting the facility's breach of their fiduciary duties and obligations to the facility residents, including Deborah Terry, the Defendants were improperly and unjustly enriched, their facility, Meadowview, was left with inadequate staff and resources to provide for the care and meet the needs of the facility's residents, including Deborah Terry suffered foreseeable and avoidable injuries set forth herein, and more specifically, bilateral femur fractures, embarrassment, depression, loss of dignity, anxiety and conscious pain and suffering, all past, present and future.

175.    The conduct of the Defendants was intentional, outrageous, willful, wanton and exhibited a reckless indifference to the safety, health, welfare, and well-being of Deborah Terry.

176.    The conduct of the Defendants was such, that an award of punitive damages is justified.

Case ID: 250500445

*WHEREFORE,* Plaintiff demands judgment in her favor and against Defendants, for compensatory damages and punitive damages, in a sum in excess of the arbitration limits.

**ROSENBAUM & ASSOCIATES, P.C.**

**BY:**    */s/ Denine Marie Moscariello*
DENINE MARIE MOSCARIELLO, ESQUIRE
Counsel for Plaintiff

Date:  November 5, 2025

Case ID: 250500445

## VERIFICATION

I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements therein are subject to the penalties of 18 Pa.C.S., § 4904, relating to unsworn falsification to authorities.

Dated: 11-5-2025

Deborah Terry, by her Attorney-in-Fact,
David Terry